52-08/MEU/SL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
NORASIA CONTAINER LINES LTD
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger (MU 0045)

JUDGE JONES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

08 CV 1114

NORASIA CONTAINER LINES LTD,

08 Civ _____ (____)

Plaintiff,

-against-

**VERIFIED COMPLAINT**

CHEMEX INTERNATIONAL LLP,

Defendant.
-------------------------------------------------------------------x

Plaintiff, NORASIA CONTAINER LINES LTD (hereinafter "NORASIA") for its

Verified Complaint against Defendant CHEMEX INTERNATIONAL LLP (hereinafter

"CHEMEX") alleges upon information and belief as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the recognition and enforcement

of a foreign maritime judgment. This case also falls under this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the Court's

federal question jurisdiction pursuant to 28 U.S.C. §1331.

2.    At all times material hereto, Plaintiff NORASIA was and still is a foreign

business entity duly organized and existing under the laws of a foreign country with an address at

18/2 South Street, Valetta, VLT 11, Malta.

NYDOCS1/298087.2

3.    At all times relevant hereto, Defendant CHEMEX was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address **c/o Garbutt & Elliot** at 2 Stable Court, Beechwoods, Elmete Lane, Roundhay, Leeds, England LS8 2LQ and 6th Floor, 32 Ludgate Hill, London, England EC4M 7DR.

4.    Plaintiff NORASIA, as carrier, contracted with Defendant CHEMEX, as shipper, to carry two 40-foot-high containers[1] said to contain 493 bags of crude naphthalene[2] from Odessa Port, Ukraine to Nhava Sheva, India.

5.    Under the contract of carriage, Defendant warranted that it would proffer the cargo in a condition and in packaging fit for the contemplated containerized carriage.

6.    Moreover, due to the hazardous nature of the cargo, Defendant undertook that such cargo would be packed in a manner adequate to withstand the risks of carriage having regard to its nature and in compliance with all laws, regulations, international conventions or requirements which may be applicable during the carriage.  In fact, pursuant to a Dangerous Goods Declaration, Defendant certified that the cargo had been packaged and put in containers in accordance with applicable international regulations, including the International Maritime Dangerous Goods Code ("IMDG Code").

7.    The contract further provided that if Defendant used containers owned by Plaintiff, then Defendant was required to return the containers in the same condition as received, and any cost to Plaintiff NORASIA to clean or wash containers returned in unclean conditions was to be paid for by Defendant.

---

[1] The containers that were provided for the carriage are the property of the carrier, Plaintiff NORASIA.

[2] Crude naphthalene is a hazardous substance which evolves flammable vapors at or below its melting point of 80 degrees Celsius.

8.      Defendant was also responsible for any damage, loss, liability, delay or expense whatsoever to the vessel, containers or other property or to persons resulting from any defect in the cargo, packaging of the cargo, stowage of the cargo and/or containerization or the cargo.

9.      After the two sealed containers containing Defendant's cargo (container no. INKU 2528909 and container no. TCKU 966977) were received by Plaintiff, they were loaded on board the M/V LOA at Odessa on or about March 26, 2007.

10.      On April 18, 2007, the M/V LOA dropped anchor at Jeddah for the scheduled transshipment of Defendant's two containers onto the M/V NORASIA BALKANS.

## I.      CONTAINER NO. INKU 2528909

11.      After the containers were discharged from the M/V LOA, it became apparent that container no. INKU 2528909 had leaked some or all of the naphthalene cargo contained therein.

12.      Container no. INKU 2528909 could not be loaded in its leaking condition onto the M/V NORASIA BALKANS, and was shifted to a dumping yard for inspection to which Marine Services Co., Ltd., a marine surveyor, attended and reported.

13.      At the inspection, container no. INKU 2528909 (which, at that point, was sitting in a pool of black liquid) was unsealed and opened, revealing the cargo packaged in 36 polypropylene jumbo bags rather than in 493 bags as described on the contract of carriage.   The surveyor concluded that the bags appeared to have been damaged either before loading or during loading/stacking in the container.

14.      After long delays caused by local port regulations and stevedore reluctance to handle the hazardous cargo, the cargo was re-packaged and stuffed into two replacement containers.

15.    On May 30, 2007, the two replacement containers were loaded on board a vessel and headed to destination at Nhava Sheva, India.

## II.    CONTAINER NO. TCKU 9666977

16.    Although its sister container was unable to proceed further after transshipment at Jeddah due to leaking, container no. TCKU 9666977 was loaded onto the M/V NORASIA BALKANS on April 17, 2007 as scheduled.

17.    However, on April 19, 2007, the Master observed that container no. TCKU 9666977 was leaking a black substance onto the hatch covers and further down onto the deck. Due to the hazardous nature of the spilled cargo, the Master posted warning notices to prevent fire and harm to the crew's health.

18.    On April 23, 2007, the vessel berthed at Jebel Ali Container Terminal, and container no. TCKU 9666977 was discharged and transported to a yard for opening and inspection to which CTC Services, a marine surveyor, attended and reported.

19.    At the inspection, container no. TCKU 9666977 (which, at that point, was sitting in a pool of black liquid) was unsealed and opened, revealing the cargo packaged in 36 polypropylene jumbo bags rather than in 493 bags as described on the contract of carriage, and that wood and steel pieces had been mixed in with the naphthalene which were protruding through at least one of the bags.

20.    The cargo was eventually re-packaged in heavy-duty plastic drums which were then properly stacked inside a container, and shipped on board the next of Plaintiff's vessels which called at the terminal to destination Nhava Sheva.

### III.    THE DISPUTE

21.    In breach of the contract of carriage, Defendant proffered improperly packaged hazardous cargo in violation of the IMDG Code.

22.    Also in breach of the contract, Defendant did not package the cargo in the manner in which it declared on the contract of carriage.

23.    Arising out of Defendant's breach, Plaintiff incurred costs at Jeddah in the amount of $36,506.58; costs at Jebel Ali in the amount of $44,097.40; vessel clean-up costs in the amount of $3,527.50; and expert consultation costs in the amount of $4,315.56, totaling a sum of $88,447.04.

24.    In further breach of the contract, and despite due demand, Defendant failed and/or refused to pay for any part of the $88,447.04.

25.    The contract of carriage provided that in the event of a dispute between the parties, resolution was to be decided by the English High Court of Justice pursuant to English law.

26.    After failed attempts to resolve the dispute amicably, on November 30, 2007, Plaintiff NORASIA initiated proceedings in the English High Court against Defendant CHEMEX, seeking to recover the costs arising out of Defendant's breach of the contract of carriage.

27.    The English High Court, after finding it had jurisdiction over the dispute and CHEMEX, on January 3, 2008, rendered a default judgment against CHEMEX for failing to appear in the action in the amount of $93,935.34 which includes the principal claims stated above plus costs and interest up to January 3, 2008 as allowed under English law.

28.    English law further provides that interest continues to accrue at the rate of 8% compounded quarterly until the judgment is paid.

29.    Although duly demanded, Defendant has refused and/or otherwise failed to pay the above judgment.

30.    There is no legitimate basis at all for Defendant to refuse to pay the judgment. Defendant's refusal and/or other failure to pay the judgment, which was made pursuant to a clear law and jurisdiction clause in the contract of carriage, is willful and in bad faith.

31.    The judgment should be recognized and enforced as a judgment of this Court under principles of comity and in conformity with Article 53 of the New York CPLR. This Court should also award Plaintiff its costs and attorneys fees incurred here in attempting to collect on the judgment by reason of Defendant's bad faith refusal to pay.

32.    In all, the claim for which Plaintiff NORASIA sues in this action, as near as presently may be estimated, totals **$117,698.52** calculated as follows: $93,935.34 judgment sum, interest of $3,763.18 calculated at 8% compounded quarterly for a period of six (6) months; and attorneys fees and costs incurred in New York in the sum of $20,000.00, no part of which has been paid by Defendant, though duly demanded. Plaintiff NORASIA specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure NORASIA.

## IV.    REQUEST FOR RULE B RELIEF

33.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff believes that Defendant has, or will shortly have,

assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant CHEMEX INTERNATIONAL LLP (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received or transferred in its name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

WHEREFORE, Plaintiff NORASIA CONTAINER LINES LTD prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant CHEMEX INTERNATIONAL LLP citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$117,698.52**, be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant CHEMEX INTERNATIONAL LLP, including but not limited to such ASSETS as may be held, received or transferred in its name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees

who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court recognize and enforce the English High Court Judgment in favor of NORASIA and against CHEMEX and also retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and

d.    For such other, further and different relief as this Court may deem just and proper in the premises, including but not limited to an award of attorneys fees incurred in this action as a result of the bad faith refusal or failure to pay on the English High Court Judgment rendered against CHEMEX.

Dated: New York, New York
       February 4, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
NORASIA CONTAINER LINES LTD

By: _____
        Michael E. Unger (MU 0045)
        80 Pine Street
        New York, NY  10005
        (212) 425-1900

## ATTORNEY VERIFICATION

State of New York )
                 ) ss.:
County of New York )

MICHAEL E. UNGER, being duly sworn, deposes and says as follows:

1.    I am an associate with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Michael E. Unger

Sworn to before me this
4th day of February 2008

_____
Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009